Daniel Sadeh, Esq.
**HALPER SADEH LLP**
375 Park Avenue, Suite 2607
New York, NY 10152
Telephone: (212) 763-0060
Facsimile: (646) 776-2600
Email: sadeh@halpersadeh.com

*Counsel for Plaintiff*

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| VERONICA PARADA,<br><br>    Plaintiff,<br><br>    v.<br><br>PIVOTAL SOFTWARE, INC., PAUL MARITZ, MICHAEL S. DELL, EGON DURBAN, WILLIAM D. GREEN, MARCY S. KLEVORN, MADELYN LANKTON, ROBERT MEE, and ZANE ROWE,<br><br>    Defendants. | Case No:<br><br><br>**COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Veronica Parada ("Plaintiff"), by Plaintiff's undersigned attorneys, for Plaintiff's complaint against Defendants (defined below), alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and upon information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys.

**NATURE OF THE ACTION**

1. This is an action against Pivotal Software, Inc. ("Pivotal" or the "Company"), and its Board of Directors (the "Board" or the "Individual Defendants") for their violations of Sections 14(a) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78n(a) and 78t(a), and Rule 14a-9 promulgated thereunder by the SEC, 17 C.F.R. § 240.14a-9, in connection with the proposed merger (the "Proposed Transaction") between Pivotal and

1

VMware, Inc. ("Parent") and Raven Transaction Sub, Inc. ("Merger Sub," and together with Parent, "VMware").

## JURISDICTION AND VENUE

2. The claims asserted herein arise under and pursuant to Sections 14(a) and 20(a) of the Exchange Act (15 U.S.C. §§ 78n(a) and 78t(a)) and Rule 14a-9 promulgated thereunder by the SEC (17 C.F.R. § 240.14a-9).

3. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

4. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act (15 U.S.C. § 78aa(c)) as Defendants conduct business in this District, and the alleged misstatements entered and subsequent harm took place within this District.

5. In connection with the acts, conduct and other wrongs alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mails, interstate telephone communications and the facilities of the national securities exchange.

## PARTIES

6. Plaintiff is, and has been at all relevant times hereto, an owner of Pivotal's common stock.

7. Defendant Pivotal, together with its subsidiaries, provides a cloud-native application platform and services in the United States. Pivotal is incorporated in Delaware and leases facilities in New York. The Company's common stock trades on the New York Stock Exchange ("NYSE") under the ticker symbol, "PVTL."

8. Defendant Paul Maritz ("Maritz") is Chairman of the Board of the Company. He previously served as Chief Executive Officer ("CEO") of the Company from 2013 through 2015. From September 2012 through March 2013, Defendant Maritz served as Chief Strategist at DellEMC. He also served as a director of VMware from July 2008, when he joined VMware as CEO, to December 2017. He was VMware's CEO from July 2008 through August 2012 and President from July 2008 to January 2011.

9. Defendant Michael S. Dell ("Dell") is a director of the Company. He has served as Chairman and CEO of Dell Technologies, Inc. ("Dell Technologies") since October 2013, as well as Chairman of Dell Inc. since he founded that company. Defendant Dell also serves as a director and non-executive Chairman of the VMware board of directors.

10. Defendant Egon Durban ("Durban") is a director of the Company. Defendant Durban is also a member of the Dell Technologies board of directors, as well as the VMware board of directors.

11. Defendant William D. Green ("Green") is a director of the Company. Defendant Green has served as a director of Dell Technologies since September 2016. He previously served as a director of DellEMC from July 2013 to August 2016 and as DellEMC's independent Lead Director from February 2015 to August 2016.

12. Defendant Marcy S. Klevorn ("Klevorn") is a director of the Company. Defendant Klevorn served as executive vice president of Mobility at Ford Motor Company ("Ford") from June 2017 to April 2019, and served as Chief Transformation Officer at Ford from May 2019 until September 2019.

13. Defendant Madelyn Lankton ("Lankton") is a director of the Company.

3

14. Defendant Robert Mee ("Mee") is the CEO and a director of the Company. Prior to joining Pivotal, Defendant Mee led the Pivotal Labs Division at DellEMC, a data storage, information security, analytics and cloud computing company, from 2012 to April 2013. Prior to that, he founded and served as CEO of Pivotal Labs LLC from 1989 until it was acquired by DellEMC in 2012.

15. Defendant Zane Rowe ("Rowe") is a director of the Company. Defendant Rowe has served as Chief Financial Officer ("CFO") and Executive Vice President of VMware since March 2016. Before joining VMware, he served as Executive Vice President and CFO of DellEMC from October 2014 through February 2016.

16. Defendants Maritz, Dell, Durban, Green, Klevorn, Lankton, Mee, and Rowe are collectively referred to herein as the "Individual Defendants."

17. Defendants Pivotal and the Individual Defendants are collectively referred to herein as the "Defendants."

### OTHER RELEVANT ENTITIES

18. VMware provides software in the areas of hybrid cloud, multi-cloud, modern applications, networking and security, and digital workspaces in the United States and internationally. VMware is incorporated in Delaware with principal executive offices located in Palo Alto, California. VMware's common stock trades on the NYSE under the ticker "VMW."

### SUBSTANTIVE ALLEGATIONS

**A. Company Background**

19. Pivotal was formed in 2013 by EMC Corporation ("EMC"), now an indirectly wholly-owned subsidiary of Dell Technologies, and VMware, now a majority-owned subsidiary of EMC Corporation.

20. On April 20, 2018, Pivotal priced its initial public offering ("IPO") at $15.00 per share of Class A common stock.

21. According to the Proxy Statement, Dell Technologies (its controlling shareholder being Defendant Dell), through its wholly-owned subsidiaries EMC Corporation and EMC Equity Assets LLC,[1] and VMware, a majority-owned subsidiary of EMC Corporation, beneficially owns 62.6% of the Company's outstanding common stock, including 94.4% of the combined voting stock of the Company, as of October 15, 2019.

### B. Events Leading Up to The Proposed Transaction

22. The Pivotal Board directed the formation of the Pivotal Special Committee "for the purpose of reviewing and potentially negotiating the potential transaction with VMware and, ultimately, recommending in favor or against any such transaction." *See* Proxy Statement at 11.

23. The Pivotal Special Committee consists of Defendants Lankton and Klevorn, two purportedly "independent and disinterested Pivotal directors who are not employees of Pivotal." *See* Proxy Statement at 11, 24. Defendant Klevorn was an officer at Ford, and Ford beneficially owns 17,516,709 shares of Pivotal Class A common stock, representing approximately 16.7% of the outstanding shares of Class A common stock of the Company as of October 15, 2019. Ford executed a voting agreement pledging to vote its shares in favor of the Proposed Transaction, subject to certain terms and conditions.

### C. The Proposed Transaction

24. On August 22, 2019, Pivotal and VMware issued a press release announcing that they had entered into a definitive merger agreement whereby VMware would acquire Pivotal in a

---

[1] More specifically, according to the Proxy Statement, "EMC LLC is a wholly owned subsidiary of EMC Corporation."

5

stock and cash transaction. Under the terms of the agreement, Pivotal's Class A common stockholders would receive $15.00 per share in cash for each share held, and Pivotal's Class B common stockholder, Dell Technologies, would receive approximately 7.2 million shares of VMware Class B common stock, at an exchange ratio of 0.0550 shares of VMware Class B common stock for each share of Pivotal Class B common stock. The press release states, in pertinent part:

### VMware Signs Definitive Agreement to Acquire Pivotal Software

August 22, 2019 16:20 ET | **Source:** VMware, Inc.

*Accelerates Any Cloud, Any App, Any Device Strategy*

*Positions VMware to deliver the most comprehensive enterprise-grade Kubernetes-based portfolio for Modern Applications*

*$11.71 Blended Price Per Share; $15 Cash Per Share for Public Stockholders Enterprise Value of $2.7 billion*

PALO ALTO, Calif., Aug. 22, 2019 (GLOBE NEWSWIRE) -- VMware, Inc. (NYSE: VMW), a leading innovator in enterprise software, and Pivotal Software, Inc. (NYSE: PVTL), a leading cloud-native platform provider, today announced that the companies have entered into a definitive agreement under which VMware will acquire Pivotal for a blended price per share of $11.71, comprised of $15 per share in cash to Class A stockholders, and the exchange of shares of VMware's Class B common stock for shares of Pivotal Class B common stock held by Dell Technologies, at an exchange ratio of 0.0550 shares of VMware Class B stock for each share of Pivotal Class B stock. In total, the merger consideration represents an enterprise value for Pivotal of $2.7 billion. The Board of Directors of each of VMware and Pivotal have approved this transaction, following the recommendations of special committees composed of independent directors of each company. Following the close of the transaction, VMware will be positioned to deliver the most comprehensive enterprise-grade Kubernetes-based portfolio for modern applications.

\* \* \*

**Details Regarding the Transaction**
Under the terms of the transaction, Pivotal's Class A common stockholders will receive $15.00 per share cash for each share held, and Pivotal's Class B common stockholder, Dell Technologies, will receive approximately 7.2 million shares of

VMware Class B common stock, at an exchange ratio of 0.0550 shares of VMware Class B common stock for each share of Pivotal Class B common stock. This transaction, in aggregate, results in an expected net cash payout for VMware of $0.8 billion. The impact of equity issued to Dell Technologies would increase its ownership stake in VMware by approximately 0.34 percentage points to 81.09% based on the shares currently outstanding. VMware currently holds 15 percent of fully-diluted outstanding shares of Pivotal. The transaction is expected to be funded through cash on the balance sheet, accessing short-term borrowing capacity, and approximately 7.2 million shares of VMware Class B common stock to Dell. Closing of the transaction is subject to customary closing conditions including the approval of the merger agreement by the holders of at least a majority of the outstanding shares of Pivotal common stock not owned by VMware or Dell Technologies or their affiliates (a "majority-of-the-minority" vote) and is expected in the second half of VMware's fiscal year 2020, which ends January 31, 2020.

**Advisors**
J.P. Morgan Securities LLC served as financial advisor and Wilson Sonsini Goodrich & Rosati served as legal counsel to VMware. Lazard served as financial advisor and Gibson, Dunn & Crutcher LLP served as legal counsel to the Special Committee of the VMware Board of Directors. Davis Polk & Wardwell LLP served as legal counsel to Pivotal. Morgan Stanley & Co. LLC served as financial advisor and Latham & Watkins, LLP served as legal counsel to the Special Committee of the Pivotal Board of Directors.

25. On November 4, 2019, in connection with the Proposed Transaction, Pivotal filed with the SEC a Schedule 14A Preliminary Proxy Statement pursuant to Section 14(a) of the Exchange Act (the "Proxy Statement").

**D. The Proxy Statement Contains Materially False and Misleading Statements and Omissions**

26. The Proxy Statement, which recommends that Pivotal shareholders vote in favor of the Proposed Transaction, omits and/or misrepresents material information concerning: (i) Pivotal's financial projections; (ii) the financial analyses performed by the Pivotal Special Committee's financial advisor, Morgan Stanley & Co. LLC ("Morgan Stanley"); (iii) potential conflicts of interest involving Company insiders; and (iv) potential conflicts of interest involving Morgan Stanley.

27. The omission of the material information (referenced below) renders the following

7

sections of the Proxy Statement false and misleading, among others: (i) Background of the Merger; (ii) Recommendation of the Pivotal Special Committee and the Pivotal Board of Directors; Purposes and Reasons for the Merger; Fairness of the Merger; (iii) Financial Projections; and (iv) Opinion of Financial Advisor to the Pivotal Special Committee (Morgan Stanley).

28. Unless and until the material misstatements and omissions (referenced below) are remedied, Pivotal shareholders will be forced to make a voting decision on the Proposed Transaction without full disclosure of all material information. In the event the Proposed Transaction is consummated, Plaintiff may seek to recover damages resulting from Defendants' misconduct.

**1. Material Omissions Concerning Pivotal's Financial Projections**

29. The Proxy Statement omits material information concerning Pivotal's financial projections.

30. The Proxy Statement provides that "Pivotal's management prepared a forecast for the fiscal year ending January 31, 2020 ("fiscal year 2020") as well as a high-level outlook for the fiscal years ending January 29, 2021 ("fiscal year 2021") and January 28, 2022 ("fiscal year 2022") (collectively the "Initial Outlook")."

31. The Proxy Statement provides that:

> [F]ollowing the end of Pivotal's first fiscal quarter ended May 2, 2019, Pivotal management reviewed Pivotal's operating performance for the first fiscal quarter of fiscal year 2020. Based on Pivotal's performance in the first fiscal quarter and management's view of Pivotal's business at the time, Pivotal management revised the forecast for fiscal year 2020, and the outlook for fiscal years 2021 and 2022 (the "Base Case"). Pivotal prepared a revised sensitivity analysis, including a "High Case," which reflects higher revenue and higher operating income assumptions, and a "Low Case," which reflects lower revenue and lower operating income assumptions (the "Base Case," "High Case" and "Low Case," collectively, the "Revised Outlook"). The Initial Outlook and the Revised Outlook (collectively, the "Management Projections") were each based upon certain financial, operating and commercial assumptions developed solely using

8

the information available to Pivotal's management at the time the respective projections were developed and prepared.

Morgan Stanley prepared extrapolations (which were reviewed by Pivotal management) of the Revised Outlook for the period from fiscal year 2020 through fiscal year 2029 (collectively, the "Extrapolated Projections," and, together with the Initial Outlook and the Revised Outlook, the "Projections").

32. The Proxy Statement provides tables summarizing the Initial Outlook and Revised Outlook projections.

33. The Proxy Statement, however, fails to disclose the following concerning the Initial Outlook and Revised Outlook projections: (1) all line items used to calculate (i) EBIT and (ii) EBITDA; and (2) a reconciliation of all non-GAAP to GAAP metrics.

34. When a company discloses non-GAAP financial metrics in a Proxy Statement that was relied upon by its board in recommending that shareholders exercise their corporate suffrage rights in a particular manner, the company must also disclose all projections and information necessary to make the non-GAAP metrics not misleading, and must provide a reconciliation (by schedule or other clearly understandable method) of the differences between the non-GAAP financial metrics disclosed or released with the most comparable financial metrics calculated and presented in accordance with GAAP. 17 C.F.R. § 244.100. The SEC has increased its scrutiny of a company's use of non-GAAP financial measures as such measures can be misleading and "crowd out" more reliable GAAP information.[2]

---

[2] Mary Jo White, *Keynote Address, International Corporate Governance Network Annual Conference: Focusing the Lens of Disclosure to Set the Path Forward on Board Diversity, Non-GAAP, and Sustainability* (June 27, 2016), https://www.sec.gov/news/speech/chair-white-icgn-speech.html (footnotes omitted) (last visited Nov. 6, 2019) ("And last month, the staff issued guidance addressing a number of troublesome practices which can make non-GAAP disclosures misleading: the lack of equal or greater prominence for GAAP measures; exclusion of normal,

35. The disclosure of Pivotal's projected financial information is material because it would provide Pivotal shareholders with a basis to project the future financial performance of Pivotal and would allow shareholders to better understand the financial analyses performed by the Company's financial advisor in support of its fairness opinion. Shareholders cannot hope to replicate management's inside view of the future prospects of the Company. Without such information, which is uniquely possessed by Pivotal and its financial advisor, Pivotal shareholders are unable to determine how much weight, if any, to place on the Company's fairness opinion in determining whether to vote for or against the Proposed Transaction.

36. Accordingly, in order to bring the Proxy Statement into compliance with SEC regulations, as well as to cure the materially misleading nature of the Initial Outlook and Revised Outlook projections, Defendants must provide a reconciliation table of the aforementioned non-GAAP metrics to their most comparable GAAP metrics. Defendants must also disclose the line item projections that were used to calculate these non-GAAP metrics. Such projections are necessary to make the non-GAAP projections included in the Proxy Statement not misleading.

37. The above-referenced omitted information, if disclosed, would significantly alter the total mix of information available to Pivotal shareholders.

### 2. Material Omissions Concerning Morgan Stanley's Financial Analyses

38. In connection with the Proposed Transaction, the Proxy Statement omits material information concerning analyses performed by Morgan Stanley.

39. The Proxy Statement fails to disclose the following concerning Morgan Stanley's "*Discounted Cash Flow Analysis*": (1) the range of terminal values in the year 2028 for each case

---

recurring cash operating expenses; individually tailored non-GAAP revenues; lack of consistency; cherry-picking; and the use of cash per share data. I strongly urge companies to carefully consider this guidance and revisit their approach to non-GAAP disclosures.").

10

that Morgan Stanley utilized in its analysis; (2) the individual inputs and assumptions underlying the (i) discount rates ranging from 9.0% to 11% and (ii) perpetuity growth rates ranging from 2.5% to 3.5%; (3) Pivotal's net debt (current) as of August 2, 2019; and (4) the fully diluted capitalization of Pivotal as of August 2, 2019.

40. The Proxy Statement fails to disclose the following concerning Morgan Stanley's "*Discounted Equity Value Analysis*": (1) Pivotal's estimated future net debt at the end of fiscal year 2022, fiscal year 2023 and fiscal year 2024; (2) the individual inputs and assumptions underlying Pivotal's assumed cost of equity of 10%; and (3) the fully diluted capitalization of Pivotal as of August 2, 2019.

41. The Proxy Statement fails to disclose the following concerning Morgan Stanley's "*Public Trading Comparables Analysis*": (1) the individual multiples and financial metrics of each of the selected companies utilized by Morgan Stanley in its analysis; and (2) the fully diluted capitalization of Pivotal as of August 2, 2019.

42. The Proxy Statement fails to disclose the individual premiums paid in each transaction utilized by Morgan Stanley in its "*Precedent Transaction Analysis*" and "*Premiums Paid Analysis*[.]" The Proxy Statement fails to identify the selected technology transactions reviewed by Morgan Stanley in its "*Premiums Paid Analysis*[.]"

43. The Proxy Statement fails to disclose the following concerning Morgan Stanley's "*Equity Research Analysts' Price Target Analysis*": (1) the specific price targets reviewed by Morgan Stanley; (2) the sources thereof; (3) the individual inputs and assumptions underlying the discount rate of 10%; and (4) the fully diluted capitalization of Pivotal as of August 2, 2019.

44. The valuation methods, underlying assumptions, and key inputs used by Morgan Stanley in rendering its purported fairness opinion and analyses must be fairly disclosed to Pivotal

shareholders. The description of Morgan Stanley's fairness opinion and analyses, however, fail to include key inputs and assumptions underlying those analyses. Without this information, Pivotal shareholders are unable to fully understand Morgan Stanley's fairness opinion and analyses, and are thus unable to determine how much weight, if any, to place on it in determining whether to vote for or against the Proposed Transaction. This omitted information, if disclosed, would significantly alter the total mix of information available to Pivotal shareholders.

### 3. Material Omissions Concerning Company Insiders' Potential Conflicts of Interest

45. The Proxy Statement omits material information concerning potential conflicts of interest involving Company insiders.

46. The Proxy Statement provides that members of Pivotal management were present at several meetings involving the Pivotal Special Committee, including, but not limited to, meetings held on March 20, March 29, April 5, April 12, April 19, June 27, July 15, July 29, July 31, August 4-6, 8, 14, 20 and 22, 2019.

47. The Proxy Statement, however, fails to disclose which members of Pivotal management attended those meetings, the extent of their involvement at the meetings, as well as the reasons for their attendance. This information is material because members of Pivotal management and the Board currently serve or have served as officers and/or directors of Dell Technologies, VMware, and/or its affiliates. Thus, shareholders are entitled to know which members of Pivotal management were present at Pivotal Special Committee meetings, as well as the reasons for their presence (including their economic motivations and roles in negotiating the Proposed Transaction).

48. The above-referenced omitted information, if disclosed, would significantly alter the total mix of information available to Pivotal shareholders.

### 4. Material Omissions Concerning Morgan Stanley's Potential Conflicts of Interest

49. The Proxy Statement omits material information concerning potential conflicts of interest involving Morgan Stanley.

50. The Proxy Statement provides that:

> In the two years prior to the date of its opinion, Morgan Stanley and its affiliates provided financing services to VMware and have received fees in connection with such services of approximately $2 million. In addition, in the two years prior to the date of its opinion, Morgan Stanley and its affiliates provided financing services to Dell and other majority-controlled affiliates and portfolio companies of Dell that Morgan Stanley has been able to identify (the "Dell Group") and have received fees in connection with such services of approximately $30 million.

51. The Proxy Statement, however, fails to disclose the nature of the specific services Morgan Stanley provided to VMware and the Dell Group.

52. Disclosure of a financial advisor's potential conflicts of interest to shareholders is required due to their central role in the evaluation, exploration, selection, and implementation of strategic alternatives and the rendering of any fairness opinions. Disclosure of a financial advisor's potential conflicts of interest may inform shareholders on how much weight to place on that analysis.

53. The omission of the above-referenced information renders the Proxy Statement materially incomplete and misleading. This information, if disclosed, would significantly alter the total mix of information available to Pivotal shareholders.

### COUNT I
### For Violations of Section 14(a) and Rule 14a-9 Promulgated Thereunder
### Against All Defendants

54. Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

55. During the relevant period, Defendants, individually and in concert, directly or

indirectly, disseminated or approved the false and misleading Proxy Statement specified above, which failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, in violation of Section 14(a) of the Exchange Act and Rule 14a-9 promulgated thereunder by the SEC.

56. Each of the Individual Defendants, by virtue of his/her positions within the Company as officers and/or directors, were aware of the omitted information but failed to disclose such information, in violation of Section 14(a) of the Exchange Act. Defendants, by use of the mails and means and instrumentalities of interstate commerce, solicited and/or permitted the use of their names to file and disseminate the Proxy Statement with respect to the Proposed Transaction. The Defendants were, at minimum, negligent in filing the materially false and misleading Proxy Statement.

57. The false and misleading statements and omissions in the Proxy Statement are material in that a reasonable shareholder would consider them important in deciding how to vote on the Proposed Transaction.

58. By reason of the foregoing, Defendants have violated Section 14(a) of the Exchange Act and Rule 14a-9 promulgated thereunder.

59. Because of the false and misleading statements and omissions in the Proxy Statement, Plaintiff is threatened with irreparable harm.

## COUNT II
**Violations of Section 20(a) of the Exchange Act**
**Against the Individual Defendants**

60. Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

61. The Individual Defendants acted as control persons of the Company within the

meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their senior positions as officers and/or directors of the Company and participation in and/or awareness of the Company's operations and/or intimate knowledge of the false statements contained in the Proxy Statement filed with the SEC, they had the power to and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the false and misleading Proxy Statement.

62. Each of the Individual Defendants was provided with or had unlimited access to copies of the Proxy Statement and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected. As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to the Proxy Statement, and to correct promptly any public statements issued by the Company which were or had become materially false or misleading.

63. In particular, each of the Individual Defendants had direct and supervisory involvement in the operations of the Company, and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same. The Individual Defendants were provided with or had unlimited access to copies of the Proxy Statement and had the ability to prevent the issuance of the statements or to cause the statements to be corrected. The Proxy Statement at issue contains the unanimous recommendation of the Individual Defendants to approve the Proposed Transaction. Thus, the Individual Defendants were directly involved in the making of the Proxy Statement.

64. In addition, as the Proxy Statement sets forth at length, and as described herein, the Individual Defendants were involved in negotiating, reviewing, and approving the Proposed

Transaction. The Proxy Statement purports to describe the various issues and information that they reviewed and considered—descriptions which had input from the Individual Defendants.

65. By virtue of the foregoing, the Individual Defendants have violated Section 20(a) of the Exchange Act.

66. As set forth above, the Individual Defendants had the ability to exercise control over and did control a person or persons who have each violated Section 14(a) and Rule 14a-9 promulgated thereunder, by their acts and omissions as alleged herein. By virtue of their positions as controlling persons, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Defendants' conduct, the Company's shareholders will be irreparably harmed.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays for judgment and relief as follows:

A. Preliminarily and permanently enjoining Defendants and all persons acting in concert with them from proceeding with, consummating, or closing the Proposed Transaction and any vote on the Proposed Transaction, unless and until Defendants disclose and disseminate the material information identified above to Company shareholders;

B. In the event Defendants consummate the Proposed Transaction, rescinding it and setting it aside or awarding rescissory damages;

C. Declaring that Defendants violated Sections 14(a) and 20(a) of the Exchange Act, and Rule 14a-9 promulgated thereunder;

D. Awarding Plaintiff reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

E. Granting such other and further relief as the Court may deem just and proper.

## **JURY TRIAL DEMANDED**

Plaintiff hereby demands a trial by jury.

Dated: November 7, 2019

Respectfully submitted,

**HALPER SADEH LLP**

By: /s/ Daniel Sadeh
Daniel Sadeh, Esq.
Zachary Halper, Esq. (to be admitted *pro hac vice*)
375 Park Avenue, Suite 2607
New York, NY 10152
Telephone: (212) 763-0060
Facsimile: (646) 776-2600
Email: sadeh@halpersadeh.com
 zhalper@halpersadeh.com

*Counsel for Plaintiff*